# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **MARC LANSBERRY, EXECUTOR OF THE** ) | |
| **ESTATE OF W.J.L.,** ) | **Case No. 3:18-cv-19** |
| ) | |
| **Plaintiff,** ) | **JUDGE KIM R. GIBSON** |
| ) | |
| **v.** ) | |
| ) | |
| **ALTOONA AREA SCHOOL DISTRICT,** ) | |
| **CHARLES PRIJATELJ,** ) | |
| **SUPERINTENDENT OF THE ALTOONA** ) | |
| **AREA SCHOOL DISTRICT; DON** ) | |
| **("DUTCH") BRENNAN, PRESIDENT OF** ) | |
| **THE ALTOONA AREA SCHOOL** ) | |
| **DISTRICT BOARD OF DIRECTORS,** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM OPINION[1]

### I.    Introduction

This is a civil-rights lawsuit arising from the suicide of W.J.L., a seventh grader at Altoona

Area School District Junior High School ("Altoona Junior High School"). W.J.L.'s father, Marc

Lansberry ("Lansberry"), brings this suit in his individual capacity and in his capacity as the

Administrator of W.J.L.'s Estate against Altoona Area School District ("AASD"), Charles Prijatelj,

AASD's Superintendent, and Don Brennan, President of AASD's Board of Directors (collectively

"Defendants"). (*See* ECF No. 15).

---

[1] The Court uses the term "Executor" in the caption because the parties use this term in their pleadings.
The Court's use of this term does not indicate that W.J.L. left a will that named Marc Lansberry as the
executor. *Compare Executor*, BLACK'S LAW DICTIONARY (10th ed. 2014) ("A person named by a testator to
carry out the provisions in the testator's will."), *with Administrator*, BLACK'S LAW DICTIONARY (10th ed. 2014)
("A person appointed by the court to manage the assets and liabilities of an intestate decedent.")

Pending before the Court is Defendants' Motion to Dismiss Lansberry's Second Amended Complaint or, in the Alternative, Motion to Strike (ECF No. 37). The Motion has been fully briefed (*see* ECF Nos. 38, 40, 43) and is ripe for disposition. For the reasons that follow, the Court will **GRANT** Defendants' Motion to Dismiss and **DENY** Defendants' Motion to Strike as moot.

## II. Jurisdiction

The Court has jurisdiction over Lansberry's federal claims pursuant to 28 U.S.C. § 1331. The Court has supplemental jurisdiction over Lansberry's state law claims pursuant to 28 U.S.C. § 1367. Venue is proper under 28 U.S.C. § 1391(b) because a substantial portion of the events giving rise to the claims occurred in the Western District of Pennsylvania.

## III. Background

### A. Factual History[2]

#### 1. W.J.L. Was Persistently Bullied as a Student at Altoona Junior High School and AASD Failed to Adequately Respond

W.J.L. attended Altoona Junior High School during the 2016-2017 school year as a seventh-grade student. (ECF No. 36 ¶ 9.)

During the school year, W.J.L. was subjected to "intense, persistent and malicious bullying" by other students. (*Id.* ¶ 10.) The bullying took various forms, including "ridicule, physical actions, threats of violence and intimidation, emotional trauma, and psychological attacks." (*Id.*)

---

[2] The Court derives the facts presented in this section from Lansberry's Second Amended Complaint (ECF No. 36). The Court accepts these facts as true for the purpose of deciding the pending motion.

The bullying was not limited to school hours nor to school grounds. (*Id.*) W.J.L. was also bullied on social media and while he walked to his father's house after school. (*Id.*)

W.J.L. experienced bullying in the presence of both Altoona Junior High faculty and students. (*Id.* ¶ 11.) "It was well known throughout the school that W.J.L. was persistently picked on by his peers." (*Id.*)

In one instance, W.J.L. was being bullied in a male teacher's classroom and requested to be excused to see the guidance counselor. (*Id.* ¶ 13). Instead of permitting W.J.L. to see the guidance counselor, the male teacher responded by telling W.J.L. that he "needed to stop being a baby." (*Id.*) Lansberry alleges that this male teacher directly participated in the bullying. (*Id.*)

Despite the fact that students and school personnel knew about the severe and persistent bullying that W.J.L. suffered, Defendants failed to take any action to address the issue. (*Id.* ¶ 14.) Furthermore, in violation of school policy, school officials never notified W.J.L.'s parents of the bullying their son experienced. (*Id.*)

On May 18, 2017, W.J.L. committed suicide "after a particularly brutal day of bullying" at school. (*Id.* ¶ 12.)

Detective Worling of the Altoona Police Department investigated W.J.L.'s suicide. (*Id.* ¶ 15.) Detective Worling's Incident Report indicates "bullying and harassment appeared to be a factor in the suicide." (*Id.*) Thereafter, the investigation was coordinated with AASD. (*Id.*)

The Altoona School District Police conducted a preliminary investigation into W.J.L.'s suicide. (*Id.* ¶ 17.) Officer Shields served as Detective Worling's point of contact with the Altoona School District Police. (*Id.*) Officer Shields indicated to Detective Worling that the preliminary investigation found that "multiple students observed W.J.L. being bullied." (*Id.*)

-3-

Detective Worling's investigation revealed W.J.L. had sought assistance from school counselors on multiple occasions. (*Id.* ¶ 18.) Michelle Saylor[3] told Detective Worling about a specific bullying incident that occurred when W.J.L. was a fifth or sixth grade student. (*Id.*) School administrators never notified W.J.L.'s parents of the incident. (*Id.*)

The investigation revealed also that another student witnessed W.J.L. crying in the office of an administrator or counselor on the date of his suicide. (*Id.* ¶ 16.)

Also, a search of W.J.L.'s iPhone and iPad revealed several conversations in the days preceding the suicide in which W.J.L. told other students that he had a desire to harm himself. (*Id.* ¶ 18.)

On May 22, 2017, Detective Worling contacted Officer Shields and requested Altoona Junior High School's security surveillance footage from May 17, 2017 and May 18, 2017. Officer Shields informed Detective Worling that there is no video surveillance for May 17, 2017.[4] (*Id.* ¶ 20.) On May 24, 2017, Detective Worling met with Assistant Superintendent Hatch, Principal Mangan, Officer Shields, and others to collect evidence. (*Id.* ¶ 27.) W.J.L.'s locker contents (other than certain personal items returned to W.J.L.'s mother) and pass book for the school hallways were not turned over, despite Detective Worling's requests. (*Id.*) Thereafter, on August 30, 2017, Detective Worling was permitted to view video footage from May 18, 2017, but the video footage from other dates was never produced. (*Id.* ¶ 20.)

---

[3] Lansberry's Second Amended Complaint does not specify Ms. Saylor's connection with W.J.L. or AASD.
[4] Officer Shields did not convey the reason the video footage is unavailable. (*Id.*) Nor is it clear why the video footage would be unavailable, as the camera system is able to store video footage for five to ten days and preserved video footage from dates in a similar timeframe. (*Id.*)

Detective Worling interviewed students who witnessed W.J.L. enter Guidance Counselor Connell's office on various occasions prior to his suicide. (*Id.* ¶ 22.) One student, K.G., witnessed W.J.L. enter Guidance Counselor Connell's office while "crying and visibly upset" three weeks prior to W.J.L.'s suicide. (*Id.*) This was one of two times K.G. witnessed W.J.L. enter Guidance Counselor Connell's office. (*Id.*) Another student, J.K., witnessed W.J.L. enter Guidance Counselor Connell's office "roughly two weeks prior to his suicide." (*Id.* ¶ 26.)

Detective Worling interviewed R.G., a student, who confirmed that R.G. told W.J.L. to "go home and shoot himself" shortly before W.J.L. committed suicide. (*Id.* ¶ 21.)

Detective Worling also interviewed three other students—T.B., B.B., and Z.B.—who each witnessed another student, B.C., "routinely harass W.J.L." for "being a ginger" and physically assault him. (*Id.* ¶ 25.) The students told Detective Worling that these incidents visibly upset W.J.L. (*Id.*)

J.K. also witnessed a group of boys physically assault W.J.L. in Stairway H at the Altoona Junior High School on three separate occasions in one week. (*Id.* ¶ 26.) These assaults took place approximately three weeks prior to W.J.L.'s suicide. (*Id.*) J.K. assisted W.J.L. after the assaults. (*Id.*) W.J.L. told J.K. that he had informed a teacher, Mrs. Zerbee, of the incidents and that he had also gone to Principal Bogle's office to report the physical assaults, but that ultimately no action was taken. (*Id.*)

AASD held a special public meeting to address W.J.L.'s suicide and bullying issues on May 25, 2017. (*Id.* ¶¶ 28-31.) At this meeting, AASD acknowledged their bullying and harassment policy was deficient. (*Id.* ¶ 30.) Superintendent Prijatelj responded to an outraged crowd by saying, "[y]ou're right. There are issues that need addressed and things that we need

to investigate, even though I hate that word. There are things we have to learn about what we do...". (*Id.*) Also, at this meeting, AASD voted to hire external counsel to review their policies with a "focus on student services." (*Id.* ¶ 31.) During the meeting, Superintendent Prijatelj offered his condolences to Lansberry's counsel and his staff, mistaking them for the Lansberry family. (*Id.* ¶ 28.)

AASD held a second public event on April 18, 2018. (*Id.* ¶ 31.) At this meeting, a member of AASD's Board of Directors stated that bullying remains a problem at the Altoona Area Junior High. (*Id.*) The board member also acknowledged that AASD received the external policy recommendations from the external counsel it hired, but that these recommendations were "contained in a thick binder" that was "collecting dust" because the Board of Directors had not reviewed them. (*Id.*)

## 2. Other Students Were Persistently Bullied at Altoona Junior High School and AASD Failed to Adequately Respond

### a. R.G.

R.G. was a student who attended Altoona Junior High School who experienced bullying at school. (*Id.* ¶ 23.) R.G. was called "ginger," told that "he ha[d] no soul" because he is a "ginger," called "gay," and told that he had no friends. (*Id.*) R.G.'s parents made several attempts to contact school administrators regarding R.G. being bullied, but school administrators took no action. (*Id.*) School personnel later confirmed to Detective Worling that R.G. was frequently bullied and that school officials took little action in response. (*Id.*) The school did not contact R.G.'s parents about the bullying until after they inquired with school officials. (*Id.* ¶ 24.) Despite

school policy to the contrary, the school did not discipline the bullies or contact their parents. (*Id.*)

### b. J.K.

J.K. was a student at Altoona Junior High School. (*Id.* ¶ 26.) J.K. was bullied and harassed on three occasions by three separate male students. (*Id.*) J.K. reported the incidents to Guidance Counselor Connell but no action was taken against the bullies. (*Id.*) And, contrary to school policy, the school did not contact J.K.'s parents or the bullies' parents. (*Id.*)

### c. An Anonymous Student

During the public meeting on May 25, 2017, the mother of an Altoona Junior High School student recounted her daughter's issues with bullying. (*Id.* ¶ 29.) The mother stated that her daughter was "forced to take matters into her own hands" because school officials never intervened to prevent the bullying. (*Id.*) The mother described one instance where bullying caused her daughter to have a "meltdown." (*Id.*) The teacher responded by mocking her daughter and telling other students to give her "a round of applause for their [*sic*] Oscar winning performance." (*Id.*) The mother arrived at the school after her daughter called her during an anxiety attack. (*Id.*) A school official warned the mother of the consequences of her daughter violating a school rule against cell-phone usage and asked the daughter, "What? Are you gonna call mommy every time you have an issue?" (*Id.*) The mother asked whether the school disciplined the students who bullied her daughter, but administrators would not answer her questions. (*Id.*)

### d.  B.R.

B.R. was an Altoona Junior High School student on the autism spectrum who experienced bullying and harassment at school. (*Id.* ¶ 32.) The first incident occurred on August 8, 2012, when B.R. had her cellphone stolen. (*Id.*) The second incident occurred on August 10, 2012, when B.R. was knocked to the ground and had her school identification card stolen by the same individual who stole his cellphone. (*Id.*) The third incident occurred in November of 2013, when B.R. was knocked unconscious by another student while walking home with a group of peers. (*Id.*) B.R. reported each of these three incidents. (*Id.*) After each report, school officials responded by stating that "boys will be boys." (*Id.*) Thereafter, in the spring of 2014, B.R. was bullied in front of a teacher, Mr. McDowell, for wearing a leather jacket and "My Little Pony" keychain. (*Id.*) When B.R. sought help, Mr. McDowell derided his choice of attire, stating: "[T]ough guy with a leather jacket and a My Little Pony keychain? What did you think was going to happen?" (*Id.*) In February of 2018, B.R.'s bullying resulted in a physical altercation. (*Id.*) School officials punished B.R. rather than the bully. (*Id.*)

### e.  R.G.K.

R.G.K. was a student at Altoona Junior High School who suffered from dyslexia and had an Individual Education Plan. (*Id.* ¶ 33.) In November of 2016, R.G.K. submitted a written complaint to Guidance Counselor Starr stating that a male student inappropriately touched R.G.K.'s private areas. (*Id.*) On March 17, 2017, R.G.K. experienced a similar incident involving the same male student. R.G.K. reported this incident to a teacher and filed a second written complaint with Guidance Counselor Starr and Principal Bogle. (*Id.*) Despite the written complaint that R.G.K. submitted to school officials, school officials never contacted R.G.K.'s

parents and did not take any action against the perpetrator. (*Id.*) School officials did not explain why they failed to take action upon learning about these incidents. (*Id.* ¶ 34.)

R.G.K.'s mother inquired about these incidents. (*Id.*) Her inquiry revealed a widespread lack of knowledge about Title IX among school officials.[5] (*Id.*) A school security guard did not know who served as the Title IX coordinator and referred R.G.K.'s mother to Guidance Counselor Starr. (*Id.*) Guidance Counselor Starr did not know who served as the Title IX coordinator and stated that she did not know what Title IX was. (*Id.*) Thereafter, R.G.K.'s mother met with Principal Bogle and Principal Mangan. (*Id.*) Neither of them knew who served as the Title IX coordinator. (*Id.*) R.G.K.'s mother also contacted the AASD Police, who similarly did not have information about the school's Title IX protocol. (*Id.*) R.G.K.'s mother also contacted the offices of Superintendent Prijatlj and Assistant Superintendent Hatch in an attempt to determine who served as the Title IX coordinator. (*Id.*) Neither superintendent's secretary knew what Title IX was, who the coordinator was, or the school's Title IX protocol. (*Id.*) Eventually, R.G.K.'s mother reached Assistant Superintendent Burlingame, who identified herself as the Title IX coordinator. (*Id.*) Assistant Superintendent Burlingame told R.G.K.'s mother that other administrators should have been aware that she serves as the school's Title IX coordinator. (*Id.*) Moreover, Assistant Superintendent Burlingame stated that all school personnel should know the Title IX protocol and that Burlingame should have been "immediately advised" about R.G.K.'s assaults. (*Id.*)

---

[5] Title IX is a section of the Education Amendments of 1972 to the Civil Rights Act. *See* 20 U.S.C. §§ 1681-1688. Title IX prevents education providers from discriminating based on sex. Education providers have an obligation to ensure that sex-based harassment is dealt with according to the Department of Education's regulations. *See* U.S. DEPT. OF EDUC., TITLE IX AND SEX DISCRIMINATION (2018), available at https://www2.ed.gov/about/offices/list/ocr/docs/tix_dis.html.

R.G.K.'s mother reviewed the 2016-17 Student Code of Conduct. (*Id.* ¶ 34.) She discovered that school policy requires the placement of red boxes outside the guidance counselor offices. (*Id.*) The red boxes are supposed to allow students to relay concerns or seek assistance from a counselor. (*Id.*) But, according to R.G.K.'s mother, there were no red boxes in the school. (*Id.*) R.G.K.'s mother asked a secretary in the guidance counselors' office about the red boxes. (*Id.*) The secretary told R.G.K.'s mother that there were never red boxes outside the guidance office. (*Id.*)

Similarly, the Student Code of Conduct provided for a text-message service that students could use to confidentially report issues to administrators. (*Id.*) However, the Student Code of Conduct did not provide a phone number to which the students could send messages. (*Id.*) Further, the Student Code of Conduct provided another phone number for students to use to report issues. (*Id.*) However, R.G.K.'s mother called this number on March 20, 2017, but had received no response as of August 2018. (*Id.*)

On April 11, 2017, R.G.K.'s mother contacted the Pennsylvania Department of Education regarding her daughter's situation. (*Id.*) The Department of Education scheduled a follow-up appointment related to R.G.K.'s situation. (*Id.* ¶ 36.) On April 17, 2017, Mike Kazup of the Pennsylvania Department of Education determined that the unwanted touching of R.G.K. constituted child abuse under Pennsylvania law. (*Id.*) Kazup noted that school personnel are required to report child abuse under 23 PA. CONS. STAT. § 6311. (*Id.* ¶ 37). As of August 2018, school personnel have not filed any reports about the incidents involving R.G.K. (*Id.*)

On the same day that R.G.K.'s mother met with Mike Kazup of the Pennsylvania Department of Education, R.G.K. told her mother that the same male student attempted to touch

her private parts during lunch. (*Id*. ¶ 36). R.G.K. reported this incident to Guidance Counselor Connell, who was serving as the faculty lunch monitor. (*Id*.) Mr. Connell told R.G.K. that "she would be fine" and took no further action. (*Id*.) The next day, on April 12, 2017, R.G.K.'s mother contacted Assistant Superintendent Burlingame regarding this incident. (*Id*.) School officials told R.G.K.'s mother that the male student would be moved to another lunchroom. (*Id*. ¶ 37.) However, the male student was in the same lunchroom the next day and continued to harass R.G.K. (*Id*.) R.G.K's mother unsuccessfully attempted to contact Assistant Superintendent Hatch. (*Id*.) Then, R.G.K.'s mother attempted to contact Sherry Campbell, Director of Special Education, but instead reached her husband, Eighth Grade Principal David Campbell. (*Id*.) R.G.K.'s mother told Principal Campbell that her daughter's situation required immediate action. (*Id*.) Thereafter, Assistant Superintendent Hatch contacted R.G.K.'s mother and told her that the incident resulted from a misunderstanding about changing R.G.K.'s lunchroom arrangements. (*Id*. ¶ 38.)

On April 17, 2017, the school held an emergency meeting with R.G.K.'s mother, Assistant Superintendent Hatch, Principal Bogle, and others. (*Id*.) At the meeting, those present determined R.G.K. would be able to leave class early to avoid the male student. (*Id*. ¶ 39.) However, R.G.K. was prevented from leaving class early the next day and was subjected to more unwanted touching of her private areas. (*Id*.) Thereafter, the male student was in the same lunchroom but was removed after R.G.K. complained to the faculty lunch monitor. (*Id*.) On April 20, 2017, the male student once again approached R.G.K. (*Id*.) The male student stood within one foot of R.G.K. and smirked at her but did not touch her. (*Id*.) R.G.K. reported the incident to a teacher and was permitted to go to Guidance Counselor Starr's office. (*Id*.) After R.G.K.'s mother

contacted Superintendent Prijatelj, R.G.K. left school early. (*Id.*) School officials never took action against the male student who harassed R.G.K. (*Id.*)

R.G.K. continues to be bullied and harassed at Altoona Junior High School and continues to report the incidents. (*Id.* ¶ 40.) School officials have not disciplined the bullies or contacted R.G.K.'s mother. (*Id.*)

## f.  M.Z.

M.Z. was a student at the Altoona Junior High School who attended summer school classes during the summer of 2018. (*Id.* ¶ 41.) On June 22, 2018, M.Z. and his friend were approached by a male student who showed them a semiautomatic firearm. (*Id.*) The armed student proceeded to remove the clip to show M.Z. and his friend that the firearm was loaded. (*Id.*) The armed student also informed M.Z. and his friend that he "had a bullet for each" of them. (*Id.*) After this conversation, the armed student proceeded into the school with the loaded firearm. (*Id.*)

In a classroom later that day, the armed student again showed M.Z. the firearm and told M.Z. that he "had bullets for his head." (*Id.*) There was no teacher present nor any cell phone reception in the classroom, which prompted M.Z. to evacuate the classroom where the second incident occurred. (*Id.*) After evacuating the classroom, M.Z. held the door shut on the armed student while another student sought help from school staff. (*Id.*) The responding teacher initially did not believe M.Z.'s report about the armed student but later determined that M.Z. was telling the truth. (*Id.*) The armed student passed the firearm to another student, who escaped the building and attempted to dispose of the firearm in the bushes. (*Id.*) Police and a S.W.A.T. team arrived and apprehended the armed student and the student who disposed of the weapon. (*Id.*)

-12-

AASD Police took a statement from M.Z. without consent from or the presence of a parent or guardian. (*Id.*) Assistant Superintendent Hatch was present for M.Z.'s statement. (*Id.*) However, M.Z.'s parents were not contacted until M.Z.'s counselor from a private company, who happened to be present that day, contacted M.Z.'s mother. (*Id.*) M.Z.'s mother retrieved M.Z. from the school upon learning of the incident. (*Id.* ¶ 42.) Afterwards, M.Z.'s mother constantly inquired about whether the school took disciplinary or legal actions against the threatening students, but never received an update. (*Id.*) M.Z.'s mother contacted both the Tenth Grade Principal and Assistant Superintendent Hatch regarding M.Z.'s continued exposure to the threatening students. (*Id.*) A special education counselor contacted M.Z.'s mother to change M.Z.'s schedule so that M.Z. could avoid the threatening students. (*Id.*) Nonetheless, school officials never changed M.Z.'s schedule. (*Id.*)

The threatening students remain enrolled in AASD schools and continue to interact with M.Z. (*Id.*) M.Z.'s mother has unsuccessfully petitioned AASD officials to address this issue several times. (*Id.*)

Altoona Junior High School never issued a lockdown or sent emergency messages to students' parents in response to this incident despite school policies requiring both lockdowns and the dissemination of emergency messages in these situations. (*Id.* ¶ 41.) School police used metal-detector wands to scan students the day after the incident. (*Id.*) School police only used these metal detectors the day after the incident, however, and school officials did not implement any other heightened security measures. (*Id.*)

## B. Procedural History

Lansberry filed a Complaint (ECF No. 1) on January 29, 2018 and an Amended Complaint (ECF No. 15) on May 18, 2018. Lansberry's Amended Complaint alleged: (1) illegal sexual harassment under Title IX of the Civil Rights Act (*id.* ¶¶ 29-48); (2) that school officials violated 42 U.S.C. § 1983 under the State-Created Danger Doctrine (*id.* ¶¶ 49-68); (3) a state-law loss of consortium claim on behalf of W.J.L.'s parents (*id.* ¶¶ 69-71); (4) a survival action (*id.* ¶¶ 72-74); and (5) a wrongful death action (*id.* ¶¶ 75-76).

Defendants moved to dismiss Lansberry's Amended Complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. (*See* ECF Nos. 16, 17.) On July 20, 2018, the Court granted Defendants' Motion to Dismiss. (ECF No. 32.) The Court dismissed Lansberry's § 1983 state-created danger claim without leave to amend (*id.* at 21-28) and dismissed Lansberry's Title IX claim and state-law tort claims with leave to amend. (*Id.* at 29-30.) The Court also allowed Lansberry leave to add a § 1983 *Monell* claim to his complaint. (*Id.*)

Lansberry filed a Second Amended Complaint on August 29, 2018. (ECF No. 36.) The Second Amended Complaint alleges: (1) a violation of 42 U.S.C. § 1983 under *Monell*; (2) a state-law survival action; and (3) a state-law wrongful death action. (*Id.*)

Before the Court is Defendants' Motion to Dismiss Lansberry's Second Amended Complaint. (ECF No. 37.) Defendants move to dismiss Lansberry's Second Amended Complaint under Rule 12(b)(6) and, in the alternative, to strike certain paragraphs of the Second Amended Complaint. (*Id.*)

## IV. Standard of Review

A complaint may be dismissed under Federal Rule of Civil Rule 12(b)(6) for "failure to state a claim upon which relief can be granted." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016). But detailed pleading is not generally required. *Id.* The Rules demand only "a short and plain statement of the claim showing that the pleader is entitled to relief" to give the defendant fair notice of what the claim is and the grounds upon which it rests. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting Fed. R. Civ. P. 8(a)(2)).

Under the pleading regime established by *Twombly* and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), a court reviewing the sufficiency of a complaint must take three steps.[6] First, the court must "tak[e] note of the elements [the] plaintiff must plead to state a claim." *Iqbal*, 556 U.S. at 675. Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679; *see also Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011) ("Mere restatements of the elements of a claim are not entitled to the assumption of truth.") (citation omitted). Finally, "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; *see also Connelly*, 809 F.3d

---

[6] Although *Iqbal* described the process as a "two-pronged approach," *Iqbal*, 556 U.S. at 679, the Supreme Court noted the elements of the pertinent claim before proceeding with that approach, *id.* at 675–79. Thus, the Third Circuit has described the process as a three-step approach. *See Connelly*, 809 F.3d at 787; *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 n.4 (3d Cir. 2011) (citing *Santiago v. Warminster Township*, 629 F.3d 121, 130 (3d Cir. 2010)).

at 786. Ultimately, the plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

## V. Discussion

### A. The Court Will Dismiss Lansberry's *Monell* Claim Because Lansberry Does not Plausibly Allege a Constitutional Violation

Lansberry's Second Amended Complaint explicitly asserts a *Monell* claim. (ECF No. 36 ¶¶ 43-67.) Lansberry alleges that Defendants had notice of the bullying problem at Altoona Junior High School but failed to adequately address it. (*Id.* ¶¶ 50-51.) Specifically, Lansberry alleges that AASD officials, including top decision-making administrators, were so poorly trained that they did not adequately react and respond to students' reports of bullying and harassment. (*Id.* ¶¶ 54-64.) Lansberry also alleges that AASD officials were so poorly trained that they were deliberately indifferent to students' complaints about harassment and bullying, despite their duties to address these issues under Title IX and Pennsylvania's Child Abuse Statute. (*Id.* ¶¶ 53, 58, 63.) Finally, Lansberry alleges that Defendants' "willful deliberate indifference and the lack of a response [to bullying] was a direct and proximate cause of the death of W.J.L. which was foreseeable as a result of the known instances of bullying/harassment that occurred before school personnel and policymakers at the junior high." (*Id.* ¶ 67.)

#### 1. § 1983 and *Monell*

For liability to attach under § 1983, a plaintiff must show that a defendant "acting under the color of state law, deprived [the plaintiff] of a right secured by the Constitution or laws of the United States." *See* 42 U.S.C. § 1983; *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 907 (3d. Cir 1997). A *Monell* claim is a specific type of § 1983

-16-

claim where a plaintiff must demonstrate that a constitutional violation was caused by a policy, custom, or practice of a municipality. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996); *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 316 (3d Cir. 1996).

Under *Monell*, a plaintiff may bring a claim under Section 1983 against a municipality if "deliberate action attributable to the municipality itself is the 'moving force' behind the plaintiff's deprivation of federal rights." *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 400 (1997) (citing *Monell*, 436 U.S. at 694 (1978)). But "a municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691; *Robinson v. Fair Acres Geriatric Ctr.*, 722 F. App'x 194, 197 (3d Cir. 2018) (quoting *Monell*, 436 U.S. at 691).

Therefore, to hold AASD liable on a *Monell* claim, Lansberry must establish (1) that AASD had a "policy or custom" and (2) that the policy or custom caused a violation of W.J.L.'s constitutional rights. *See Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003) (citing *Bryan Cty.*, 520 U.S. at 404). Therefore, the requirement of an underlying constitutional violation is implicit in the Third Circuit's *Monell* framework. *See Gayeman v. Sch. Dist. of City of Allentown*, No. 14-cv-1518, 2016 WL 3014896, *12 (E.D. Pa. May 26, 2016) (holding that a plaintiff asserting a *Monell* claim must plead an underlying constitutional violation)

As the Third Circuit has explained, "[n]ot all state action rises to the level of a custom or policy." *Natale*, 318 F.3d at 584. Rather, "[a] policy is made 'when a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues a final proclamation, policy or edict.'" *Id.* (quoting *Kneipp v. Tedder*, 95 F.3d 1199, 1212 (3d Cir. 1996)). "Customs, when

-17-

referred to in the context of § 1983 actions, include only 'practices of state officials . . . so permanent and well settled as to constitute a custom or usage with the force of law.'" *Robinson,* 722 F. App'x at 198 (internal quotation marks omitted) (quoting *Monell,* 436 U.S. at 691).

"There are three situations where acts of a government employee may be deemed to be the result of a policy or custom of the governmental entity for whom the employee works, thereby rendering the entity liable under § 1983." *Id.* (quoting *Natale,* 318 F.3d at 584). First, an employee's action results from a policy or custom when a municipal official implements a generally applicable official policy and the subsequent complained-of act is an implementation of that policy. *Id.* (citing *Natale,* 318 F.3d at 584). Second, an employee's action results from a policy or custom "where no rule has been announced as policy but federal law has been violated by an act of the policymaker itself." *Id.* (internal quotation marks omitted) (quoting *Natale,* 318 F.3d at 584). Third, and relevant here, an employee's actions are the result of policy or custom:

> where the policymaker has failed to act affirmatively at all, [though] the need to take some action to control the agents of the government is so obvious, and the inadequacy of existing practice is so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need.

*Id.* (internal quotation marks omitted) (alteration in original) (quoting *Natale,* 318 F.3d at 584).

Because Lansberry has not alleged that W.J.L.'s suicide resulted from a "generally applicable statement of policy" or "an act of the policymaker itself," *id.,* Lansberry must satisfy the third theory of *Monell* liability by establishing that AASD acted with deliberate indifference to W.J.L.'s constitutional rights. *See id.*

As the Third Circuit recently noted, "[d]eliberate indifference stems from government inaction, namely a [municipality's] failure to train its employees on avoiding constitutional

-18-

violations." *Wright v. City of Phila.*, 685 F. App'x 142, 147 (3d Cir. 2017). "To show the deliberate

indifference required for a 'failure to train' claim, a § 1983 plaintiff must show 'a municipal actor

disregarded a known or obvious consequence of his action.'" *Id.* (3d Cir. 2017) (quoting *Bryan

Cty.*, 520 U.S. at 410). Deliberate indifference "may stem from a failure to act despite notice [that

municipal] employees continually violate citizens' rights." *Id.* "When [municipal] policymakers

are on actual or constructive notice that a particular omission in their training program causes

[municipal] employees to violate citizens' constitutional rights, the [municipal entity] may be

deemed deliberately indifferent if the policymakers choose to retain that program."[7] *Id.* (quoting

*Connick v. Thompson*, 563 U.S. 51, 62 (2011)).

### 2. Lansberry Fails to Adequately Plead that W.J.L.'s Constitutional Rights Were Violated

A plaintiff must plead the violation of a specific constitutional right to hold a municipality

liable under a *Monell* deliberate-indifference theory. *See Gayeman*, 2016 WL 3014896, *12 (holding

that a plaintiff asserting a *Monell* claim must plead an underlying constitutional violation); *see also*

---

[7] In some cases, "a single constitutional violation may amount to deliberate indifference." *Wright*, 685 F. App'x at 147 (citing *City of Canton*, 489 U.S. at 390). For instance, "[t]he Supreme Court hypothesized policymakers would be deliberately indifferent to citizens' rights if they 'kn[ew] to a moral certainty' armed officers would have to arrest fleeing felons but failed to train those officers on the constitutional limitations on the use of deadly force." *Id.* (quoting *Canton*, 489 U.S. at 390). In these circumstances, the need for special deadly-force training would be "so obvious" that not providing it would amount to deliberate indifference and would constitute a policy attributable to the municipality. *Id.* (citing *Canton*, 489 U.S. at 390). "But such oversights will only amount to deliberate indifference in a 'narrow range of circumstances.'" *Id.* (quoting *Bryan Cty.*, 520 U.S. at 409). Furthermore, "[i]n virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident." *Id.* (quoting *Canton*, 489 U.S. at 392). With this in mind, the Supreme Court has cautioned courts to resist "engag[ing] . . . in an endless exercise of second-guessing municipal employee-training programs." *Id.* (quoting *Canton*, 489 U.S. at 392). However, the Court will not reach this issue because the parties have not raised the issue of whether AASD's failure to intervene to prevent the bullying of W.J.L. constitutes a "narrow circumstance" that would, by itself, constitute deliberate indifference.

*Bridges ex rel. D.B. v. Scranton Sch. Dist.*, 644 F. App'x 172, 178 (3d Cir. 2016) ("To hold the school district liable for a failure to train under Section 1983, appellants must demonstrate *that there was a constitutional violation* and that the violation was caused by the school district's policy or custom.") (emphasis added) (citing *Kneipp v. Tedder*, 95 F.3d 1199, 1212 n.26 (3d Cir. 1996)).

Lansberry acknowledges this requirement in his Second Amended Complaint. (*See* ECF No. 36 ¶ 44) ("To establish a valid claim under Section 1983, a plaintiff must demonstrate that the defendant, while acting under the color of state law, deprived him of a right secured by the Constitution or the laws of the United States.") (citing *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir. 1995); *Moore v. Tartler*, 986 F.2d 682, 685 (3d Cir. 1993)).

Lansberry generally alleges that Defendants' deliberate indifference to bullying and harassment resulted in the deprivation of W.J.L.'s constitutional rights. (*Id.* ¶ 65.) For example, Lansberry's Second Amended Complaint alleges that "W.J.L. was a victim of the Defendant's [*sic*] willful deliberate indifference and the lack of response despite a clear pattern of ongoing bullying/harassment issues occurring before, contemporaneously, and presently, and was a direct and proximate cause of the *constitutional violations of W.J.L.'s bodily integrity.*" (*Id.* ¶ 66.) However, this is the only allegation in Lansberry's Second Amended Complaint regarding the constitutional right that Defendants allegedly violated.

In their Motion to Dismiss, Defendants argue that "Plaintiff has failed to satisfy the threshold requirement that he plead a constitutional violation." (ECF No. 38 at 9-12.) Despite Defendants' thorough arguments on this point, Lansberry does not squarely address the specific constitutional violation that underlies his *Monell* claim in his response to Defendants' Motion. (*See* ECF No. 40 at 5-10.)

-20-

Therefore, the Court will take Lansberry's Second Amended Complaint at face value and assume that Lansberry is arguing that Defendants' deliberate indifference caused violations of W.J.L.'s constitutional right to bodily integrity under the Due Process Clause of the Fourteenth Amendment of the Constitution.

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. AMEND. XIV, § 1. The right to bodily integrity is protected by the substantive component of the Due Process Clause. *See Phillips v. Cty. of Allegheny*, 515 F.3d 224, 235 (3d Cir. 2008) ("Individuals have a constitutional liberty interest in personal bodily integrity that is protected by the Due Process Clause of the Fourteenth Amendment.") (citing *D.R. v. Middle Bucks Area Vocational Tech. Sch.*, 972 F.2d 1364, 1368 (3d Cir. 1992)).

"But as the Supreme Court has explained, 'nothing in the language of the Due Process Clause itself requires the State to protect life, liberty, and property of its citizens against invasions by private actors.'" *Gayeman v. Sch. Dist. of City of Allentown*, 712 F. App'x 218, 220 (3d Cir. 2017) (quoting *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989)). In *DeShaney*, the Supreme Court held that "[a]s a general matter . . . a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney*, 489 U.S. at 197.

Rather, the purpose of the Due Process Clause is to "protect people *from* the State, not to ensure that the State protect[s] [the people] from each other."[8] *Gayeman*, 712 F. App'x at 220 (citing

---

[8] The Court recognizes that the leading Third Circuit case on students' right to bodily integrity in public schools is *Morrow v. Balaski*, 719 F.3d 160 (3d Cir. 2013) (en banc), *cert. denied*, 134 S. Ct. 824 (2013), where the Court held that "public schools, as a general matter, do not have a *constitutional* duty to protect students

*DeShaney,* 489 U.S. at 197). The Due Process Clause functions as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security.[9] *DeShaney,* 489 U.S. at 195 (citing *Davidson v. Cannon,* 474 U.S. 344, 348 (1986); *Daniels v. Williams,* 474 U.S. 327, 331 (1986)).

Courts within the Third Circuit have confronted *Monell* claims in the context of student-on-student school bullying and have consistently found that the plaintiffs failed to allege the violation of a constitutional right. *See Mohammed ex rel. Mohammed v. Sch. Dist. of Phila.,* 355 F. Supp. 2d 779, 787 (E.D. Pa. 2005) ("Because the School District and its employees did not create the danger that resulted in Richard's harm, any failure to protect Richard from the misguided punch was not an infringement on his constitutional rights."); *DeWitt v. Del. Valley Sch. Dist.,* No. 3:10-cv-1836, 2011 WL 3033361, at *3 (M.D. Pa. July 25, 2011) (dismissing plaintiff's *Monell* claim "[b]ecause the Court finds no constitutional violation" in a case where a teacher failed to prevent one student from attacking another); *Magwood v. French,* 478 F. Supp. 2d 821, 831-32 (W.D. Pa. 2007) (dismissing the plaintiff's *Monell* claim because the plaintiff-student's harm was not caused by a constitutional violation by a district official); *D.M. by Sottosanti-Mack v. Easton Area Sch. Dist.,* No. 17-1553, 2017 WL 6557560, at *8 (E.D. Pa. Dec. 22, 2017) (finding that a school's alleged lack of security policies was insufficient to establish a constitutional violation where one student stabbed another with a pencil); *Bridges ex rel. D.B. v. Scranton Sch. Dist.,* 66 F. Supp. 3d 570, 585-88

---

from private actors." *Id.* at 170. However, *Morrow* deals with the state-created danger doctrine, and not a *Monell* claim. Therefore, the Court's analysis will focus primarily on cases involving *Monell* claims, and not other varieties of § 1983 claims.

[9] The state-created danger doctrine is an exception to the general rule that the Due Process Clause does not guarantee minimal levels of safety and security. *See Gayeman,* 712 F. App'x at 220. However, the Court dismissed Lansberry's § 1983 claim under the state-created danger doctrine with prejudice. *(See* ECF No. 32 at 29-30.)

(M.D. Pa. 2014), *aff'd* 644 F. App'x 172, 178 (3d Cir. 2016) ("Appellants cannot recover under Section 1983 for failure to train because there was no underlying constitutional violation.").

The Third Circuit has held that there was no constitutional violation where a plaintiff brought a *Monell* claim against a school district for failing to prevent student-on-student bullying. In *Bridges*, a fourth-grade student, D.B., was persistently bullied by his classmates. *Bridges*, 644 F. App'x at 174. In that case, plaintiffs—the student and his parents—brought a Section 1983 *Monell* claim alleging that the school district failed to train its employees to avoid constitutional violations. *Id.* at 178. Plaintiffs alleged that other students physically attacked D.B. and injured him on multiple occasions. *Id.* at 174. Plaintiffs also alleged that D.B.'s teacher was notified of the bullying, that she failed to act to reconcile the bullying, and that the teacher herself verbally abused D.B. *Id.* at 176. In their *Monell* claim, Plaintiffs alleged that "D.B. was deprived of his liberty interest and right to bodily integrity as a result of the student-on-student bullying in the first grade." *Id.* at 176. The district court granted summary judgment in favor of the school district because the plaintiff did not properly allege a constitutional violation. *See Bridges*, 66 F. Supp. 3d at 585-88. On appeal, the Third Circuit affirmed. *Bridges*, 644 F. App'x at 178. The Third Circuit held that plaintiffs' "Fourteenth Amendment claims are ultimately foreclosed by this Court's [en banc] decision in *Morrow v. Balaski*, 719 F.3d 160 (3d Cir. 2013)." *Id.* at 174. In *Morrow*, the Third Circuit held that "public schools, as a general matter, do not have a *constitutional* duty to protect students from private actors," including other students. *Id.* at 170.[10] Although *Morrow*

---

[10] In *Morrow*, the Third Circuit synthesized Supreme Court and prior Third Circuit opinions to conclude that public schools do not have a constitutional duty to protect students from private actors. *See* 719 F.3d at 165-70. In its decision, the Third Circuit adopted Supreme Court dicta stating that public schools do not, "as a general matter have such a degree of control over children as to give rise to a constitutional 'duty to protect.'" *Id.* at 169 (citing *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 655 (1995)).

did not involve a *Monell* claim, the Third Circuit in *Bridges* held that its en banc decision in *Morrow* precluded the plaintiffs in *Bridges* from pleading the requisite constitutional violation. *Id.*

Similarly, in *Gayeman*, the Third Circuit affirmed a district court decision granting summary judgment in favor of the defendant-school district on the plaintiff-student's *Monell* claim. *Gayeman*, 712 F. App'x at 219. There, the plaintiff-student alleged that the school knew that the student was susceptible to a gang-related attack but failed to prevent its occurrence. *Id.* The plaintiff-student brought Section 1983 claims against the school under *Monell* and the state-created danger doctrine. *Id.* at 220. At summary judgment, the district court dismissed the plaintiff's *Monell* claim because the plaintiff failed to allege a constitutional violation. *See Gayeman*, 2016 WL 3014896, *12. The district court's decision relied on the holdings in *Morrow*, 719 F.3d at 166, and *DeShaney*, 489 U.S. at 197, that "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Gayeman*, 2016 WL 301486, at *5. Ultimately, the district court concluded that "[b]ecause there has been no constitutional harm, the School District cannot be liable under § 1983" and granted summary judgment in favor of the school district on the plaintiff's *Monell* claim. *Id.* at *12. On appeal, the Third Circuit affirmed the district court's decision, stating that "[w]e agree with the district court that Gayeman's *Monell* claim fails because there was no underlying constitutional violation." *Gayeman*, 712 F. App'x at 221 n.3.

Courts within other circuits have reached the same conclusion when dealing with *Monell* claims involving student-on-student bullying. *See Hill v. Blount Cty. Bd. of Educ.*, 203 F. Supp. 3d 871, 885 (E.D. Tenn. 2016) (dismissing *Monell* claim brought by students who alleged racial harassment because "the school's failure to stop third parties from harassing plaintiffs does not

rise to the level of a constitutional violation"); *Mohat v. Mentor Exempted Village Sch. Dist. Bd. of Educ.*, No. 1:09-cv-688, 2011 WL 2174671, at \*8 (N.D. Ohio June 1, 2011) (holding that "the school's failure to stop third parties from harming Eric (in this case the bullies, and/or Eric, himself), although tragic and possibly preventable, does not rise to the level of a constitutional violation"); *Vidovic v. Mentor City Sch. Dist.*, 921 F. Supp. 2d 775, 798 (N.D. Ohio 2013) (holding that plaintiffs' *Monell* claim failed because "Plaintiffs have not provided any evidence that could establish the violation of any constitutional right owed to them or their daughter"); *Doe v. Dallas Indep. Sch. Dist.*, 194 F. Supp. 3d 551, 567 (N.D. Tex. 2016) (holding that school could not be held liable under *Monell* for teacher's aide's failure to prevent student-on-student sexual harassment); *Dorsey v. Pueblo Sch. Dist. 60*, 140 F. Supp. 3d 1102, 1119 (D. Colo. 2015) (dismissing *Monell* claim against school bully and municipal defendants "because Plaintiff cannot establish an underlying constitutional violation").[11]

In these cases, courts have found that school officials did not violate the students' right to bodily integrity under the Fourteenth Amendment of the Constitution by failing to prevent student-on-student bullying or violence.[12] *See, e.g., Bridges*, 644 F. App'x at 178. Put differently,

---

[11] In at least two of the cases cited above, the bullied student ultimately committed suicide. *See Vidovic*, 921 F. Supp. 2d. at 799; *Mohat*, 2011 WL 2174671, at \*2.

[12] During the Court's research on *Monell* claims in the school bullying context, the Court only uncovered two district court decisions where a *Monell* claim was allowed to proceed based on a school's alleged violation of a student's constitutional right to bodily integrity by failing to prevent student-on-student bullying. *See Lewis v. Blue Springs Sch. Dist.*, No 4:17-cv-538, 2017 WL 5011893 (W.D. Mo. Nov. 2, 2017); *T.Y. v. Shawnee Mission Sch. Dist. USD 512*, No. 17-2589-DDC-GEB, 2018 WL 2722501, at \*10 (D. Kan. June 6, 2018) (citing *Lewis*). In *Lewis*, the court found that the school was on notice of a bullying problem and that the school district "failed to properly train its employees in effective ways to respond to and prevent bullying." *Lewis*, 2017 WL 5011893, at \*11. The court in *Lewis* also noted that "empirical research has shown for the past 20 years that severe, ongoing, targeted bullying in schools is pervasive and routinely results in clinical depression, suicidal thoughts, and suicide among its targeted victims. Anti-bullying policies and law, when complied with, have been proven to reduce and prevent such bullying." *Id.* The court there ultimately concluded that the school's "failure to train and supervise . . . deprived [the student] of his rights,

-25-

the cases are in agreement that students do not have a constitutional right to be free from bullying and harassment from other students.

Here, the Court is obligated to reach the same conclusion—Lansberry's Second Amended Complaint does not sufficiently allege the violation of a constitutional right. Lansberry only alleges that AASD officials were deliberately indifferent to W.J.L.'s right to bodily integrity by failing to prevent other students from bullying W.J.L. The Court recognizes that the bullying W.J.L. was subjected to at AASD was appalling and that it created a truly dreadful experience for W.J.L. at Altoona Junior High School. The Court further recognizes that school bullying is a pervasive problem nationally and the possibility that bullying might eventually result, as it did here, in tragic harm to the bullied student. And finally, the Court recognizes that AASD officials have consistently failed to stop bullying and therefore allowed a toxic bullying environment to flourish. If that situation was recognized as a constitutional violation then the ruling of this Court would be contrary to the result of this case.

However, harm caused by student-on-student bullying is not a constitutional harm that *Monell* protects against. Regardless their obligations under school policy and the common sense proposition and public expectation that school officials should keep students safe from known risks, AASD officials had no recognized constitutional obligation to protect W.J.L. from his peers. The Fourteenth Amendment right to bodily integrity protects individuals against harm caused

including his right to bodily integrity, to be secure and to be left alone, to his life, and his rights to substantive due process." *Id.* The Court firstly notes that the Eighth Circuit, in which the Western District of Missouri lies, has a different standard for failure-to-train *Monell* claims. Second, the Court notes that the court in *Lewis* did not thoroughly analyze the underlying constitutional violation before allowing the student-plaintiff's *Monell* claim to proceed. The same distinctions apply to the *T.Y.* case. *See T.Y.*, 2018 WL 2722501, at \*8-10.

by state actors, and not harm caused by third parties. Here, Lansberry does not allege that AASD officials directly violated W.J.L.'s right to bodily integrity. Rather, Lansberry alleges that AASD officials failed to prevent third parties—W.J.L.'s classmates— from violating W.J.L.'s right to bodily integrity. And while the persistent bullying ultimately resulted in W.J.L.'s deciding to take his own life, Lansberry does not allege that any AASD official played a direct role in this tragic decision, or that any AASD official had notice that W.J.L. planned to harm himself. Therefore, AASD officials' failure to intervene before W.J.L.'s suicide does not establish that those same officials violated W.J.L.'s constitutional right to bodily integrity by failing to protect W.J.L. from bullying at school.

Moreover, because at least some of the bullying occurred after school and through electronic means, it is not clear that AASD officials would have been able to prevent the bullying completely, even if they had exercised extreme diligence in enforcing Altoona Junior High School's anti-bullying policy. Lansberry alleges that a portion of the bullying occurred "off school property while on his walk to his Father's residence and through social media." (ECF No. 36 ¶ 10.) In his investigation, Detective Worling found messages where other students at Altoona Junior High School sent harassing messages to W.J.L.'s iPhone and iPad. (*Id.* ¶ 23.) These messages could have been sent to W.J.L.'s iPhone and iPad after school hours. Thus, it is not clear that AASD officials could have completely prevented the W.J.L.'s bullying, and the harm that it ultimately caused, even if they had aggressively enforced the school's anti-bullying policies.

Accordingly, the Court is obligated to find that Lansberry does not sufficiently allege the violation of a constitutional right. The Court is sensitive to the tragic situation that the Lansberry family has been forced to endure and strongly condemns the repeated failure of AASD officials

to prevent bullying in the time leading up to W.J.L.'s death. The Court also believes that bullied students and their families should have some recourse against school officials who fail to create a safe learning environment and repeatedly fail to protect students from known dangers. However, prior case law does not allow bullied students and their families to hold school officials accountable through constitutional litigation in the federal courts.[13] Therefore, the Court is obligated to dismiss Lansberry's *Monell* claim.

## B. The Court Will Dismiss Lansberry's Wrongful Death and Survival Action Claims Because Lansberry Does Not Plead a Plausible *Monell* Claim

Lansberry also asserts state-law claims against Defendants under Pennsylvania's Wrongful Death Act and Survival Act. (ECF No. 36 at 29-30.) *See* 42 PA. CONS. STAT. ANN. § 8301 (Wrongful Death Act); 42 PA. CONS. STAT. ANN. § 8302 (Survival Act).[14]

Under Pennsylvania law, "wrongful death and survival actions are not substantive causes of action; rather, they provide a vehicle through which plaintiffs can recover for unlawful conduct that results in death." *Johnson v. City of Philadelphia*, 105 F. Supp. 3d 474, 483 (E.D. Pa. 2015) (citing *Sullivan v. Warminster Twp.*, 765 F. Supp. 2d 687, 707 (E.D. Pa. 2011); *Carroll v. Skloff*, 202 A.2d 9, 10-11 (Pa. 1964)). Because wrongful death and survival actions are not independent claims, a

---

[13] " It cannot be denied that schools both create and regulate the conditions to which students are subject during the school day. [T]he state ought to be seen as incurring a narrow, concomitant responsibility to act as one would expect the child's parents to act: to protect the child from that danger." *See Morrow*, 719 F.3d at 187 (en banc) (Fuentes, J. dissenting).

[14] The difference between a wrongful death action and a survival action lies in the remedy available to the plaintiff-survivor. *Mohney v. Pa.*, 809 F. Supp. 2d 384, 389 n.6 (W.D. Pa. 2011). In a wrongful death action, a decedent's survivor is compensated for the losses they sustained as a result of the decedent's wrongful death. *Id.* (citing *Tulewicz v. SE Pa. Transp. Auth.*, 606 A.2d 427, 431 (Pa. 1992); *In re Hendrickson*, 274 B.R. 138, 150 (Bkrtcy. W.D. Pa. 2002)). On the other hand, "a survival action is not a new cause of action but is a continuation in the deceased's personal representative of the cause of action which accrued to the deceased under common law." *Id.* (citing *Harvey v. Hassinger*, 461 A.2d 814, 817 (Pa. Super. Ct. 1983)).

plaintiff asserting these claims must assert some other independent, cognizable claim to survive a motion to dismiss the wrongful death and survival claims. *See Salvio v. Amgen, Inc.*, 810 F. Supp. 2d 745, 757 (W.D. Pa. 2011) (dismissing wrongful death and survival claims because they "cannot be brought . . . as claims in-and-of themselves, because an underlying claim, such as negligence, is needed for these claims to be cognizant . . ."); *Palakovic v. Wetzel*, No. 3:14-cv-145, 2015 WL 3937499, at *12 (W.D. Pa. June 26, 2015), *rev'd on other grounds*, 854 F.3d 209 (3d Cir. 2017).

Wrongful death and survival actions have often been brought alongside Section 1983 claims. Section 1983 is thus recognized as a sufficient underlying basis for accompanying wrongful death and survival claims under Pennsylvania law. *See, e.g., Estate of Kempf v. Washington Cty.*, No. 15-cv-1125, 2018 WL 4354547 (W.D. Pa. Sept. 12, 2018). However, Lansberry's wrongful death and survival claims fail because Lansberry did not plead a cognizable Section 1983 claim under *Monell*. Accordingly, the Court will dismiss Lansberry's wrongful death and survival actions.

## VI. Conclusion

While the Court is troubled by Defendants' failure to maintain a safe environment at Altoona Junior High School and sensitive to the tragedy the Lansberry family has endured, the Court must dismiss Lansberry's *Monell* claim because Lansberry does not adequately plead a constitutional violation. And because Lansberry's *Monell* claim fails, the Court must also dismiss Lansberry's state law wrongful death and survival actions. The Court will not grant leave to amend because amendment would be futile—Lansberry has twice failed to assert plausible

constitutional claims and there is no indication that another amended complaint would survive

a motion to dismiss.[15]

An appropriate order follows.

---

[15] "[I]f a complaint is subject to a Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile. *CollegeSource, Inc. v. AcademyOne, Inc.*, 579 F. App'x 116, 126 (3d Cir. 2015) (quoting *Philipps*, 515 F.3d at 245). Amendment would be futile "if the amended complaint would not survive a motion to dismiss for failure to state a claim upon which relief could be granted." *Munchak v. Ruckno*, 692 F. App'x 100, 102 (3d Cir. 2017).

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MARC LANSBERRY, EXECUTOR OF THE** | ) | **Case No. 3:18-cv-19** |
| **ESTATE OF W.J.L.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **JUDGE KIM R. GIBSON** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **ALTOONA AREA SCHOOL DISTRICT,** | ) | |
| **CHARLES PRIJATELJ,** | ) | |
| **SUPERINTENDENT OF THE ALTOONA** | ) | |
| **AREA SCHOOL DISTRICT; DON** | ) | |
| **("DUTCH") BRENNAN, PRESIDENT OF** | ) | |
| **THE ALTOONA AREA SCHOOL** | ) | |
| **DISTRICT BOARD OF DIRECTORS,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER

AND NOW, this _20th_ day of December 2018, upon consideration of Defendants'

Motion to Dismiss Lansberry's Second Amended Complaint or, in the Alternative, Motion to

Strike (ECF No. 37), **IT IS HEREBY ORDERED** that the Motion to Dismiss is **GRANTED.**

Plaintiff's Second Amended Complaint is hereby dismissed with prejudice. Further, Defendants'

Motion to Strike is **DENIED** as moot.

BY THE COURT:

**KIM R. GIBSON**
**UNITED STATES DISTRICT JUDGE**